Opinion delivered March 7, 1888.

No. 2469.

HARVE BONNARD *v.* THE STATE.

1. PRACTICE—MURDER—EVIDENCE.—The defense, on a trial for murder, offered, but was not allowed to prove that, on the night before the homicide, a difficulty occurred between the defendant and the principal witness for the prosecution ; that when the said witness, having followed the defendant a certain distance, was told by him to stop, the said witness turned off and at the same time threatened to see the defendant again and shoot him. *Held*, that the proposed evidence was admissible under the rule that an accused on trial is entitled to prove the hostility and bias of the witnesses against him so that the same may be considered by the jury in passing upon the credibility of the witnesses.

2. SAME.—The prosecution having proved by certain ladies the statements concerning the homicide made to them by defendant soon after the homicide, the defense proposed to prove a different statement made by the defendant to his brother when they met on the night of but after the homicide, and also the fact that he then told his brother that he had made different statements to the ladies, and explained to him the reasons which influenced him in making the said different statements to the ladies. *Held*, that the exclusion of the proposed evidence was error, inasmuch as it clearly came within the purview of Article 751 of the Code of Criminal Procedure, which provides that "when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence."

8. SAME.—CHARGE OF THE COURT—CASE STATED.—It was the State's theory in this case that the defendant and the deceased had been at enmity for several months, and that the defendant had made serious

threats against the life of deceased, which threats had been communicated to the deceased, and that the deceased, anticipating a difficulty with defendant, prepared himself for the difficulty whenever he should meet defendant. There being evidence tending to support this theory, the trial court should have charged the jury that if, under these circumstances, both parties had determined in their minds to bring on a difficulty whenever they should meet, in which each intended to kill the other, or inflict serious bodily injury which might result in death, then, if a fatal difficulty ensued—no matter what provoked it—the party killing would be guilty of murder.

4. SAME—MANSLAUGHTER—"ADEQUATE CAUSE."—In view of the evidence in this case, the trial court erred in failing to instruct the jury to the effect that if the defendant did not intend to provoke a difficulty with deceased, but sought him solely for the purpose of demanding payment of a money demand, and a difficulty ensued in which defendant, on account of abuse heaped upon him by deceased, voluntarily slew the deceased in the heat of passion engendered by the abuse, in connection with previous wrongs done him by the deceased, and the circumstances, all together combined, were of such a character as to produce adequate cause sufficient to render the mind incapable of cool reflection, then the killing would be manslaughter. And further, the trial court, under the facts of this case, should have instructed the jury to the effect that if defendant sought an interview with the deceased with no hostile intentions, and deceased became enraged, and committed an assault upon defendant which did inflict pain or bloodshed, and under the passion thus engendered, defendant shot and killed deceased, the pain or bloodshed would amount to "adequate cause," and the killing would be manslaughter.

5. SAME—SELF DEFENSE.—Under the facts of this case the trial court should also have instructed the jury to the effect that, if the defendant sought the interview with deceased with no hostile intentions, but merely to demand payment of his claim, and deceased became angry, and an altercation ensued during which the deceased drew his pistol and assaulted defendant with it in such manner as to create in the latter's mind a reasonable apprehension of death or serious bodily injury, and, acting upon such reasonable apprehension, defendant fired the fatal shot, then he was justifiable on the ground of necessary self defense.

APPEAL from the District Court of Johnson. Tried below before the Hon. J. M. Hall.

The conviction in this case was in the second degree for the murder of Ben Shultz, in Johnson county, Texas, on the sixth day of February, 1886. The penalty assessed by the verdict was a term of seven years in the penitentiary.

Ike Moore was the first witness for the State. He testified that he was present and witnessed the difficulty between defendant and Shultz, which terminated in the shooting and the

subsequent death of Shultz. **The difficulty** occurred in Johnson county, Texas, early in the month of February, 1886, and at about eight o'clock at night. The witness and Shultz had an engagement to call upon some young ladies at the house of Mrs. Welch on that night. Witness reached Mrs. Welch's house a short time after dark, and found defendant and William Styron already there. After the witness had remained at the house about thirty minutes, one of the girls told him that he had better leave, or that he would get into trouble. Witness then got on his horse and left, to go to the house of Nick Williamson, about three-quarters of a mile distant from Mrs. Welch's. He was overtaken at a point about half way between Mrs. Welch's and Williamson's by the defendant and William Styron. Defendant joined witness and rode with him a short distance, talking over a difficulty they had on the night before, at a party given at the house of one Page. The conversation between witness and defendant resulted in the settlement of the trouble which arose between them on the previous night. That trouble came about in this way: Defendant approached witness in the house at Page's party, and invited him to a conference in the yard. On reaching the yard, defendant told witness that he had heard that witness and Shultz had said that if he, defendant, came to that party on that night, he and said Shultz were going to run him off. Witness assured defendant that he had never made such a statement, and then defendant asked him if Shultz was going to pay him for his spurs. Witness replied that he did not know, and that defendant would have to see Shultz about that. After this, defendant asked witness if the trouble of the night before was satisfactorily settled. Witness replied that it was. They then stopped, and witness and Styron became engaged in conversation. About that time Shultz rode up, whistling. He said: "Good evening, gentlemen," and defendant said to him: "Come this way, Ben; I want to see you." Defendant and Shultz then rode to a point about twenty steps from where witness and Styron were talking, and engaged in a conversation, of which the witness heard no more than that defendant asked Shultz if he intended to pay him for some spurs. Shultz said that he did not, and then they had some talk about some leggins. Witness next heard defendant call Shultz a d—d liar; he next heard a blow, then the report of a pistol, and saw a flash from the defendant's pistol. Shultz's horse sprang to the side of the road, when defendant fired two more shots at Shultz. Shultz

then ran off on his horse, and defendant fired two more shots at him as he fled. Witness remained on the ground but few minutes. He then went to Nick Williamson's house, where he found Shultz shot through the neck, from which shot he died a few days later. The interval of time which elapsed between the sound of the blow and the sound of the first shot was perceptible, but was too brief to be computed. Five shots were fired, none of which, so far as witness could see, were fired by Shultz. Shultz's horse sprang forward at the first shot, and kept going. Defendant's horse jumped backward. Defendant and Styron hallooed a time or two as witness rode off. Witness's engagement to call at Mrs. Welch's that night was made on the night before. He could not say that defendant or Styron knew that he or Shultz were to be there on that night.

Cross examined, the witness testified that at present he had no fixed habitation, but, at the time of the fatal difficulty between defendant and Shultz, he lived near Mrs. Welch's. Witness denied that, during the party at Page's on the night before, and in the house, while it was going on, he said to any body, in the presence and hearing of one Joe Bidwell: "It will open directly." He denied that he *followed* defendant from Page's house to his gate, when the party broke up on that night, but he did *walk with* the defendant to the gate. He denied that he followed the defendant from the gate to the point where defendant mounted his horse, and that, at that point, in the presence of Joe Bidwell, the defendant told him to go back, and that he replied to defendant that he was "all wool, a yard wide, and hard to curry; I will see you again, and shoot a hole in you a yellow dog can jump through." Witness admitted that, on the examining trial of this case, he testified that, "at the time of the difficulty defendant asked Shultz to ride this way; that he wanted to see him. Defendant and Shultz rode off twenty-three or twenty-four steps from the road. I heard some one give the lie. I took it to be defendant, but could not be certain which it was. I then heard a lick pass. I then heard a shot. Styron was talking to me at the time." On the same trial, witness testified as follows: "We met the night before at a dance at Ed Page's. Defendant was with Ida Bizzell. He was standing about half way between the house and the gate. I asked him what right he had to accuse me of stealing a rope. He said he had a good deal of right. We walked to near the gate 'sorter' beside each other, and he told me to walk around him, and I told him all

right." The statements embraced in quotations above was the evidence of the witness on the examining trial. It was given when witness's memory was as good as it is now, was read over to him, and he signed it with his mark. Witness did not testify on the examining trial about defendant inviting him out of Page's house, and asking him if Shultz was going to pay for the spurs; nor did he then testify about threats uttered by defendant against Shultz. Witness was not asked particularly about those facts, but supposed that the prosecuting counsel asked him to tell all he knew at that time. Witness admitted that he further testified on the examining trial: "After the shooting I galloped to Nick Williamson's house, and found Shultz standing in the floor of the house." His present testimony was the same, with the addition that Shultz was shot in the neck. Witness denied that, on the evening after the shooting, he told Bob Graves, in said Graves's house, late, that Shultz fired two shots at defendant and that defendant fired three shots at Shultz. Witness did not see a pistol at Nick Williamson's either on that night or the next morning. He did not buckle Shultz's pistol on Mat Walsh on the next morning in Nick Williamson's horse lot. He did testify, on the examining trial, that he did see a black handled pistol at Williamson's house on the morning after the shooting. Witness, defendant and Shultz were at a party at Ace Bizzell's house in the spring of 1885, when defendant lost his spurs. Witness did not take defendant's spurs, nor did Ace Bizzell take them for the witness and Shultz. Witness did not know that Shultz got those spurs until four days after the party. Shultz went "out west" soon after the party at Bizzell's and did not return until a short while before he was killed.

Miss Florence Bizzell testified, for the State, that defendant and William Styron came to Mrs. Welch's house on the evening of the tragedy, about dark. About an hour later the State's witness, Ike Moore, arrived, and went into the kitchen, in which the witness and the defendant then were. Witness invited Moore to take a seat, but he declined, stood in the door for a short time, smoking, and then passed into the next room, and presently left, remarking that he was going to Nick Williamson's. Defendant said nothing about Moore that witness heard while Moore was at the house. Just before Moore reached the house the witness asked the defendant to have no row with Moore while at the house, and he promised that he would not. Within a few moments after Moore left, defendant got up from

his seat, mounted his horse, and said that he would overtake Moore and settle their difficulty of the night before. One of the girls present seized the bridle reins of defendant's horse and asked him not to follow Moore. About that time Styron remarked that he was going with defendant and would see that no difficulty would take place. Defendant and Styron then rode off, and in a few minutes the witness heard loud talking in the direction in which they had just gone. About this time Ben Shultz rode up to Mrs. Welch's and got off his horse. He then got back on his horse, and one of the girls seized the bridle reins and tried to keep him from following after the other parties, but failed to detain him. When Shultz had been gone a short time, the witness heard five reports of a pistol, fired very nearly together. She then heard the running of horses, and somebody hallooed twice. Two or three minutes later she heard two men coming to Mrs. Welch's from the direction in which the several parties had recently gone. Just before they reached the house witness heard a voice she took to be defendant's say: "I knew something would be done when I got there." Defendant and Styron soon appeared, and witness asked them what had happened. Defendant replied: "Nothing, only that Ike and him got into a row, and that Ike struck him over the head with a pistol, and he shot at Ike as he ran." Witness asked him if he was hurt, and he replied that nobody was hurt. Witness then saw blood on his face, and asked him again if he was not hurt. He replied that his head hurt him a little. Styron also said that defendant and Ike Moore had had a row, and that Moore struck defendant over the head with a pistol, and that defendant fired at him as he ran. While still on his horse, at Mrs. Welch's, after his return, the defendant said that he was going to reload his pistol, and at the spot where his horse stood at that time the girls, on the next morning, found one loaded cartridge and three hulls. Ike Moore remained at Mrs. Welch's about thirty minutes. Defendant and Styron remained but few minutes after they returned from the scene of the shooting. If Shultz's name was mentioned by either defendant or Styron during their visit to Mrs. Welch's, either before or after the difficulty, witness did not hear it. If either defendant or Styron knew that the deceased and Ike Moore had an engagement at Mrs. Welch's on that night, the witness was not aware of it.

Cross examined, the witness said that she heard no person ask Moore, when he arrived at Mrs. Welch's on the fatal night, to

leave in order to avoid trouble. Moore left voluntarily, so far as witness knew, saying that he was going to Williamson's but giving no reason for going there. Witness observed a difference in the sounds of the five shots. Two of them were louder and much more distinct than the other three. Witness and Ben Shultz were friends, but the witness declined to say whether or not she was engaged to be married to him. When recalled by the State, the witness declared that she was not engaged to marry Shultz at the time of his death. Shultz was then waiting upon her sister Ida, who had since died. Witness admitted that she wept when Shultz was buried. According to some people, she "took on considerably" on that occasion.

Miss Mary Welch testified, for the State, that Shultz and Ike Moore had a kind of conditional engagement to call at witness's mother's house on the night of the difficulty, but if defendant or Styron knew anything about it witness did not know it. Defendant and Styron reached witness's house about dark. Ike Moore came about an hour later. If anything was said about Ike Moore when he arrived, or before, witness did not hear it. Moore remained about thirty minutes and then said that he would go to Williamson's. He left, going down the branch toward his horse. About that time the defendant came out of the house and said that he would follow Moore and see him about the "little racket" they had on the night before. One of the girls present seized the reins of his horse and asked him not to go. Styron said: "Let him go; I will see that they have no row." Defendant and Styron rode off up the road in the direction Moore had recently gone. A few minutes later the witness heard some loud talking up the road, and about that time Ben Shultz rode up, got off his horse and asked for Ike Moore. One of the Misses Bizzell told him that Moore had started to Williamson's, and that defendant and Styron had followed him, and that they were then talking up the road. Shultz mounted his horse and rode off up the road in the direction the other boys had recently gone, and within a very short time the witness heard five reports of a pistol. Witness then heard the halloo of some person, which sounded more like the halloo of fun than of anger. Witness counted the shots, but was too frightened to note any difference in the sounds. Defendant and Styron came back to the house soon after the shots were fired. Just before reaching the house the defendant, talking to Styron, said: "By God, I knew that something would be done when I got

there." When defendant and Styron reached the house the for-
mer was asked what had happened. He replied that he and Ike
Moore got into a row; that Moore struck him over the head with
a pistol, and that, as Moore fled, he shot at him. Witness then
asked defendant if he was hurt. He first replied that he was
not, but, when his attention was called to the blood on his head,
he replied that his head hurt him. Defendant reloaded his pis-
tol at the place where this conversation took place, and on the
next morning the cartridge hulls and a loaded cartridge were
found at that place.

Cross examined, the witness said that when Shultz asked
where Ike Moore was, Miss Ida Bizzell told him that Moore was
up the road where the boys were talking ; that she feared a dif-
ficulty was in progress between defendant and Moore, and asked
Shultz to go to the said parties and see that Ike Moore had fair
play. Shultz then went off in the direction the other parties
had gone. The witness heard no body tell Moore on that night
that he had better leave Mrs. Welch's house in order to avoid
trouble. She did not hear defendant speak a word against
Shultz on that night. The shooting took place about a quarter
of a mile from Mrs. Welch's house.

J. N. Shultz, the brother of the deceased, testified for the
State, that Ben Shultz was shot on the night of February 6, 1886,
and died on the tenth day of the same month. Witness was
sent for after the shooting, and arrived at Nick Williamson's
about two hours after it occurred. Ben was then sitting on the
bed, and was conscious. As witness entered the room, Ben said:
"Jim, I am about gone." Witness then asked Ben if he could
tell him how the difficulty occurred, but he was unable to make
a statement. About two hours afterwards, he stated to the wit-
ness that he was riding along the road whistling, when he came
upon defendant, Styron and Ike Moore, talking. He spoke to
them saying : "Good evening," when defendant said "come this
way, Ben ;" that he and defendant rode to a point twenty or
twenty-five steps distant from Moore and Styron ; that, when
they left Moore and Styron, defendant placed his hand on his pis-
tol and asked him if he was going to pay for the spurs ; that he
replied : "No, Harve;" that defendant then said : "Wiley
Sullivan told me that you and Ike Moore are going to get up a
party, and steal my leggins;" that he replied to defendant :
"Harve, Wiley never told you any such thing ;" that defendant
then said to him : "You are a d—d liar!" that he then struck

defendant, and defendant shot him; that his horse jumped with him at the first shot, and that he then ran his horse to Williamson's. Ben Shultz was about twenty-five years old and weighed about one hundred and eighteen pounds.

Cross examined, witness said that Ben Shultz was making the witness's house his home at the time of his death. He owned a forty-five calibre six-shooter. The said pistol had a black handle. Ben carried it strapped under his arm. Witness did, perhaps, testify on the examining trial as follows : "My brother, in his statement to me, said : 'I saw Harve Bonnard put his hand in his pocket as though he was going to pull a pistol as he started to ride off.'" Witness recognized that sentence as part of his evidence on the examining trial, but he did not think that what he said was correctly written down. Nick Williamson was present when the deceased made the statement to witness.

Doctor Williamson testified, for the State, that he was a physician and surgeon, and as such was called to see Ben Shultz, about 9 o'clock on the night of February 6, 1886. He found the said Shultz suffering from a gun shot wound in the right side of the neck. He was conscious, but breathing hard. He died from the effect of that wound February 10, 1886. He made a statement to witness just before his death, at which time he was perfectly rational. He said : "Ike Moore and myself were going to be at Mrs. Welch's that night. When I got there the girls told me that Ike had gone, and that Harve Bonnard and William Styron had followed him, and that they heard talking down there, and for me to go up there and see fair play, or see Moore out. I then rode up to them and Harve called me out and asked me if I was going to pay him for the spurs. I replied that I was not. Bonnard then said that he had heard that I had written back that I would pay for them. I told him again that I would not pay for the spurs. Then Harve said that he had heard that Ike Moore and myself were going to get him at a party and steal his leggins. I disputed his word, and then Harve gave me the d—n lie. I again disputed his word and he called me a d—n liar. Then I struck him, and about the time I hit him, he shot me."

Bob Graves testified, for the State, that he saw Ben Shultz on the night that he was shot. Witness was sent for and got to Nick Williamson's, where Ben was, about the time that Jim Shultz got there. Ben made a statement to witness in the presence of J. N. Shultz and Nick Williamson. He thought that he

was going to die, but was rational at the time he made the statement. He said: " I rode up in the road where Harve Bonnard, Will Styron and Ike Moore were talking, and Harve asked me out to one side and said he wanted to see me. We rode out a few steps from the road, and when we got there Harve said to me: 'Ben, I want you to pay me for them spurs you took off last spring.' I told him I would not do it. He then said: 'Ben, Wiley Sullivan told me that you and Ike Moore are going to invite me to a party to get to steal my leggins.' I told him that Wiley Sullivan never told him any such thing. He then gave me the d—d lie, and I hit him, and as I hit him he shot me ; my horse jumped, and I could not stop him. Harve shot at me three times."

Cross examined, witness said that Ben Shultz did not say to him in this conversation, at which Jim Shultz was present, that Harve placed his hand in his pocket or on his pistol as he rode from Moore and Styron to the side of the road. Deceased may have made another statement to Jim Shultz which witness did not hear. Witness knew the State's witness, Ike Moore. He had a conversation with the said Moore at his (witness's) horse lot, on the evening after the shooting, in the course of which conversation Ike Moore told witness that Ben Shultz fired two shots in the fight, one of which was fired into the ground and the other over the rump of his horse as he fled. Witness heard Jim Shultz several times ask Ben: "Old fellow (or brother), were you to blame in this difficulty?" Ben each time replied: "I think not."

Wiley Sullivan testified, for the State, that he never, at any time or place, told defendant that Ben Shultz and Ike Moore were going to invite him to a party and get or steal his leggins. Witness remembered that, on one occasion, a short time before the difficulty, defendant rode up to witness's house in a wagon, and entered into a conversation with Ace Bizzell. Witness did not then tell defendant that Ben Shultz and Ike Moore were going to invite him to a dance and take his leggins; nor did Ace Bizzell, in witness's hearing, tell defendant that he had heard witness say any such thing, nor did witness tell Ace Bizzell any such thing. Witness and defendant were not on good terms.

Sam Bain testified, for the State, that, at McAllister's house, in the fall of 1885, he heard defendant say that when Ben Shultz, who was then "out west," got back, he and said Ben Shultz

would have trouble. He said this in connection with his statement that Ben Shultz took off his spurs without paying for them. Defendant was talking to Mr. McAllister at that time. It was the understanding of the witness that Mr. McAllister was now living out west.

Reuben Bramlette testified, for the State, that, some time before Ben Shultz returned to Johnson county from the west, he heard the defendant say that he intended to have pay for his spurs as soon as Ben Shultz got back.

Ace Bizzell testified, for the State, that a short time before Ben Shultz got back to Johnson county from "out west," he, witness, met the defendant at Fort Spunkey, on the edge of Johnson county, when defendant said to witness: "I have heard that Ben Shultz is coming back. You had better fix yourself, for when he gets back we will have a racket."

Cross examined, the witness said that he gave a party at his house in the spring of 1885. Ben Shultz, Ike Moore and defendant were among those in attendance. When defendant reached the house he took off his spurs and hung them up on the corner of the house, on the outside. During the night, and while dancing was going on, Ben Shultz and Ike Moore came to witness and told him that they wanted defendant's spurs. Witness told them that the spurs were hanging on the corner of the house, and that if they wanted them they could get them. They replied that they had no means of concealing them; that they wanted witness to take and hide them, and that they would come and get them on the next day. Witness, Ben Shultz and Ike Moore went together to the corner, and witness took the spurs, and, in the presence of Ike Moore, put them in the loft of his smoke house, from which place Ben Shultz and Moore got them on the next day. Shultz left, a few days after that, to go out west to drive cattle. He remained away until the winter of 1885. During his absence witness wrote to him about the spurs, and he wrote back, directing the witness to pay for them, promising that, when he returned, he would pay the witness, as he had had the use of them. Witness did not pay for the spurs, but told defendant that Ben had written him that he would pay for them when he got back. The witness supposed that he was influenced to aid in the theft of the spurs by reason of the fact that he had fallen into bad company. The witness went out west in 1886. On his return home, in June of that year, he had a conversation with John Bonnard, the brother of the defendant, in which he

told John Bonnard that he had never heard defendant say anything against Ben Shultz, or make any threat against him, and that, so far as witness knew, the very best of feeling existed between defendant and Ben Shultz up to the night of the shooting. Witness was at Wiley Sullivan's house a few weeks before the shooting. Defendant rode up in a wagon and called witness out. Witness went out and took a seat in defendant's wagon. Sullivan was then standing in his door, but witness could not say that Sullivan heard what was said by either witness or defendant. Witness then and there told defendant that Wiley Sullivan told him that Ben Shultz and Ike Moore were going to invite him (defendant) to a party and steal his leggins. Witness could not now swear that it was true that Sullivan told him such things, but it was his impression that he did. At all events, witness made that statement to defendant.

Re-examined, the witness said that when he got back home from the west, defendant came to his house and told him that he, defendant, would give anything if witness could remember what Sullivan did say, and would swear to it just as Sullivan said it.

Re-cross examined, witness said that defendant did not suggest that he should swear to anything but the truth, but insisted that witness had told him that Ben Shultz and Ike Moore had said that they were going to invite him to a party and take his leggins; and witness did, in fact, make that statement to the defendant. Jim Shultz, the brother of the deceased, visited witness in Eastland county, and tried to get witness to change his evidence on this point, but he, too, said that he only wanted witness to testify to the truth.

William Armstrong testified, for the State, that a short while before Ben Shultz got back from the west, the defendant told him that Shultz and Ace Bizzell had stolen his spurs, and that if they did not pay for them when Ben got back he would take it out of their hides. Correcting himself, the witness said that the defendant said that he would take it out of Ben Shultz's hide.

The State next read in evidence the written testimony of Miss Ida Bizzell, as it was delivered before the examining court. She testified on that trial, in substance, that defendant and Will Styron came to Mrs. Welch's house on the evening of the shooting, about sundown. Ike Moore arrived about thirty minutes later. He came to the house singing. Before he got there

Styron said to defendant:  " He is coming," and defendant struck himself in the breast with his hand and said:  "God d—n my black soul!  If he fools with me I will shoot the top of his head off." Witness heard no one tell Ike Moore to leave in order to avoid a row.  Ike soon left, when the defendant started to follow him. Mary Welsh and witness endeavored to prevent defendant from following Moore, but he and Styron finally left together, going in the direction Moore had recently gone.  Ben Shultz reached the house about five minutes after defendant and Styron left. He remained but a few minutes, and then left saying that he was going to look for Ike Moore.  He had been gone about twenty minutes when witness heard five reports of a pistol.  The first three of the five shots were fired more rapidly than the remaining two.  Within the next five minutes the defendant and Styron came back to the house.  Witness asked defendant what had happened.  He replied that Ike Moore struck him over the head with a six shooter and fled, and that he fired at Moore, but that nobody was hurt.  Witness then asked Will Styron what happened, and he made substantially the same statement.  Defendant and Styron soon left, going off in a lope.  Witness did not know whether or not defendant and Styron knew that Shultz and Moore were to be at Mrs. Welsh's house on that night.  Witness found one cartridge and three cartridge hulls in the yard on the next morning.  Witness saw defendant throw the shells out of his pistol after he came back to Mrs. Welch's.

The State closed.

Joe Bidwell testified, for the defense, that he was at the party at Page's on the night before the difficulty, and, while the dancing was going on, he heard Ike Moore say: " It will open directly."  Witness did not see Ike Moore invite the defendant out of the house during the party.  Defendant and Styron got up the party at Page's and invited the guests.  Witness did not think that Ike Moore or Ben Shultz were invited to that party.

Nick Williamson testified, for the defense, that Shultz died at his house.  Witness heard the fatal shots, and, soon after they were fired, he heard the running of horses.  Shultz then rode up to witness's house and said that he was shot.  After getting Shultz into the house the witness sent for a doctor and went after Jim Shultz.  On his return with Jim Shultz he sent for Bob Graves, at the request of Ben Shultz, to pray.  When witness got up (from praying) he knocked a chair over, and his wife called his attention to a pistol under the chair.  After an hour

or two Ben Shultz asked about his pistol. Witness's wife told him that she pushed it under the bed, and witness told him that his pistol was all right, and he said no more about it. During the night witness saw a black handled pistol lying on the table, but he did not know that that pistol belonged to Ben Shultz. The scabbard was then lying under the bed. On the next morning witness saw Ike Moore buckle that scabbard, with the pistol in it, on Matt Walsh. Moore and Walsh, who were then in witness's horse lot, said that the pistol and scabbard belonged to Ben Shultz. When Jim Shultz arrived at witness's house he asked Ben how he happened to get shot. Ben, in the hearing of the witness, told Jim that he rode up on Ike Moore, Will Stryon and defendant, who were jowering about some tales that had been told by somebody; that defendant called him to the side of the road and asked him if he was going to pay for the spurs; that he replied in the negative; that defendant then said that Wiley Sullivan told him that he, Ben, and Ike Moore were going to get him, defendant, at a party and take his leggins; that he replied that Wiley Sullivan had told him, defendant, no such thing; that defendant then called him a liar; that he then struck defendant, and defendant shot him, and his, Ben's, horse began to pitch and ran off. Ben at no time, in the hearing of the witness, said that defendant put his hand on his pistol when he first invited him, Ben, to "step aside."

On his cross examination, this witness said that the first three shots were fired about as nearly together as one man could shoot from the same pistol. The fourth shot followed the third after a short interval, and was instantly followed by the fifth.

Matt Walsh testified, for the defense, that he got Ben Shultz's pistol at Nick Williamson's house on the morning after the shooting. It then contained three empty cartridges. Somebody, witness did not remember who, buckled the scabbard of that pistol on him, in Williamson's horse lot. Witness and defendant were not friends, and were not on speaking terms.

John Bonnard, the brother of the defendant, testified, in his behalf, that defendant, at the time of the difficulty with Ben Shultz, was under the treatment of a physician in Acton, Hood county, for a broken arm. He broke his arm about eight weeks before the shooting, and, at the time of the shooting, had gotten so that he could use it passably well. He was riding and breaking a wild horse for witness at the time of the shooting. The spurs referred to by the witnesses in this case belonged to the witness,

when stolen.   Ben Shultz went "out west" shortly after the theft of the spurs, and, during his absence, wrote back to Jim Shultz and Ace Bizzell to pay for the spurs.   They did not do so. Soon after Ben's return, witness told the defendant to ask Ben to pay for the spurs, but to make the request in a friendly, peaceable manner, and at a time and place when no other person was present; warning defendant that a demand in the presence of a third party might excite Ben to anger.   Witness then lived about three miles distant from the place of the shooting, and defendant lived with him.   Defendant and Styron got together on that morning, and were together all day, breaking a wild horse for the witness.   They got back to witness's house about ten o'clock on the night of the shooting.   Defendant was bloody from head to foot.   Two wounds were found on his head. One of these wounds was a very severe one, and was quite a month getting well.   The weapon which made it cut a gash in the heavy thirteen inch felt hat which he wore.   That cut in the hat passed through the felt, three-eighths of an inch thick, a lining of leather, and padding of paper which, the hat being too large for defendant, had been placed between the hat and the sweat leather lining.   The gash described by witness was not in the hat on the day before the difficulty.   The wound in the head, which corresponded with the gash in the hat, and the wound just above it were about as far apart as the hammer of a six-shooter, and the cylinder of the same are apart.   After getting his wounds washed, defendant went to the house of witness's brother-in-law, and remained there until he surrendered to the sheriff, three days later.   The State's witness, Ace Bizzell, in June, 1886, told witness that he had never heard defendant utter any threats against Ben Shultz, and that he regarded them as the best of friends until he heard of the shooting.   Witness never heard defendant utter any threats against Ben Shultz, and always thought they were friends until the shooting occurred. He knew the defendant and Ike Moore were not on friendly terms.   Defendant remained at the house of witness's brother-in-law until witness went to Cleburne and got the officers to make the arrest, or rather, accept the surrender.   During that time witness knew that the officers of Somervell county were hunting for defendant, but he did not disclose to them defendant's whereabouts, as he did not want defendant taken to Glen Rose.   The shooting occurred on the line of Somervell and

Johnson counties, and witness preferred that the defendant should be taken into custody in Johnson county.

D. A. Strain testified, for the defense, that he lived about a mile from the place of the shooting. He heard five shots on the night of the difficulty, and was satisfied from the sound that three shots were fired by one person and two by another. The sound indicated a "cross fire." Defendant and Styron were at witness's store on the morning of the day on which the shooting occurred. Defendant was then riding a wild horse.

The absence of William Styron from the State being shown, the defense read in evidence his written testimony taken at the examining trial. He testified on that trial, in substance, that he and defendant went to Mrs. Welch's house about dusk on the evening of the difficulty. Ike Moore came about thirty minutes later, remained about twenty minutes and left. Defendant said that he would overtake Moore. The girls interfered to prevent defendant from following Moore. Witness asked them to let him go, and promised to go with the defendant and prevent a difficulty. When they overtook Moore, defendant joined him, Moore, and rode with him about two hundred yards, witness riding along behind them. He could not hear what was said by either Moore or defendant, more than that a rope was mentioned by one of them. Moore and defendant finally stopped. Defendant then turned his horse to ride off, and Moore asked him if their trouble was settled. Defendant replied that it was, and started to ride off. Witness then rode up to Moore and asked him what kind of tales he had been circulating about the Styron girls. He denied that he had criticised the girls, and witness proceeded to denounce him as a liar, etc. While this was going on, Ben Shultz came up, whistling. Defendant remarked to Shultz that he wanted to see him. He and Shultz then rode off to the side of the road and entered into a conversation, which the witness did not hear, he at that time being engaged in his dispute with Moore. Presently witness heard the sound of a violent blow delivered by one of the parties. He looked in time to see defendant fire a shot, which was immediately returned by Ben Shultz. Shultz then started off in a run. When he reached a point about seventy-five yards distant, Shultz turned in his saddle and fired a second shot at defendant. Defendant fired three and Ben Shultz two shots.

Immediately after the shooting, defendant, who was then bleeding profusely from the head and face, said to witness:

"While Ben and I were talking I saw that he had a white han-dled pistol on his left side. He put his hand on his pistol and I put my hand on mine. He struck me and I shot at him. When we went out there I asked Ben about the spurs. I told him that I heard he wrote to Jim Shultz to tell Ace Bizzell to pay for the spurs, and that he would pay Ace when he got back. He then told me that he had used the spurs, but that they were not worth fifteen cents, and he would not pay for them. I then told him that all I wanted was pay for the spurs, and no row. I then told him that Wiley Sullivan told me that he (Ben) and Moore invited me to the dance to get a chance to take my leggins. He said that Wiley told me no such thing. I disputed his word. He disputed my word; I disputed his again and he struck me." This witness further stated that when he and defendant got back to Mrs. Welch's, the girls asked him what had happened, and that he told them, "Nothing, only Harve and Ike had a rucus." From Mrs. Welch's, witness went to John McCreary's house, and thence to John Bonnard's. Word had been brought to witness, defendant and Will Walsh that it was reported that they were going to meet Moore at a dance and whip him, and that Moore had applied to Ben Shultz to go with him to prevent more than one person attacking him at a time. Witness and defendant did not know that they would meet either Ben Shultz or Moore at Mrs. Welch's. Defendant followed Moore from Mrs. Welch's for the purpose of settling his previous difficulty with him, which he did. Witness went with him to keep down a row, and then concluded to call Moore to account for his talk about the Styron girls. Witness was not armed on that night, nor did he know that defendant was until the shooting took place. Defendant and witness got together about ten o'clock in the morning, and were together until after the shooting. When he got back to Welch's after the shooting, defendant told the girls that nobody was hurt.

Mrs. Nick Williamson testified, for the defense, that soon after Ben Shultz came to her house, and before he pulled off his clothes, and before any one else got there, she saw a black handled pis-tol, similar in appearance to that in evidence, lying on the floor under a chair. An hour or two later Ben asked about his pistol, and was told that it was all right. That pistol did not belong to Nick Williamson.

A number of witnesses testified, for the defense, that they

had known defendant for years, and that he had always been reputed to be a quiet, peaceable and inoffensive boy.

The brief of the counsel for the appellant discloses the substance of the excluded testimony, which is the subject matter of two of the rulings of this court.

*Poindexter & Padelford,* for the appellant: The first and second assignments of error relate to the action of the court in refusing to allow appellant to prove by Joe Bidwell that, on the night before the difficulty, the State's witness, Ike Moore, at a party at Ed. Page's, followed appellant out of the gate and said he would see appellant again and shoot a hole through him a dog could go through. Also, in refusing to allow appellant to prove, by his brother, John Bonnard, that, on the next morning, this being the day of the difficulty, he heard of the threat of Ike Moore, made at the party, and that he then met his brother (appellant) and told him that Ike Moore was a dangereus man and would kill him if he got the drop on him, and to arm himself with a pistol and look out for Moore; and that appellant then armed himself with the pistol he had at the time of the difficulty with deceased; that this was the only reason appellant was armed, and that he was not armed with a view of meeting deceased.

1. The witness Moore was the main State witness upon whom the State depended largely for a conviction of appellant. We therefore think the evidence of Joe Bidwell tended to show the state of his feelings toward appellant, and should have been admitted upon this ground.

2. The witness Moore, when upon the stand, denied following appellant and making the threat imputed to him by Joe Bidwell.

We therefore think the evidence of Bidwell tended to impeach the witness Moore, and was admissible for that purpose. (Mason v. The State, 7 Texas Ct. App., 623; Butler v. The State, 7 Texas Ct. App., 635.)

3. The theory of the State was, as will appear by an inspection of the statement of facts and charge of the court, that appellant, at the time of the difficulty with deceased, Ben Shultz, was armed for and seeking a difficulty with him, and provoked this difficulty with him in order to have a pretext for shooting him. We therefore contend that it was material to show that Ike Moore had made this threat against the life of appellant the night before, and that on the morning of the day of the difficulty appellant's

brother, knowing Moore to be a dangerous man, warned appellant to be on his guard, and to arm himself for Moore, and that he did arm himself with the pistol for Moore, and not for Ben Shultz, the deceased. The difficulty took place the night after the party, about eight o'clock, on a road near Mrs. Welch's, about three miles from appellant's home. The State showed that appellant, in company with William Styron, came to Mrs. Welch's about dark, and remained there about an hour before Ike Moore came; that Moore and Ben Shultz had an engagement to call on the young ladies there; that Moore came, but fearing trouble with appellant, remained only about a half an hour, and that when he left, the appellant and William Styron followed him for the purpose of settling the trouble between Moore and appellant; that they caught up with Moore about two hundred and fifty yards from the house, and there they stopped and were talking when the deceased rode up to Mrs. Welch's ; that, hearing loud talking in that direction, he rode on up to where Moore, Styron and appellant were, and that, when deceased rode up, appellant asked him out to one side; that they rode out about twenty steps from Moore and Styron, and were there talking, when Ben Shultz (deceased) struck appellant, and appellant fired upon and shot Shultz, etc. The State sought to prove by the young ladies at Mrs. Welch's that night, that appellant knew of the appointment of Shultz to be there that night, and also that when there, appellant inquired for Shultz.

The court charged the jury that a homicide in self defense is justifiable, provided the difficulty was not provoked. And if defendant provoked the difficulty with intent to kill, it would not be justifiable, etc. Was it not material to show why appellant was armed with a pistol, and that he was not armed for the purpose of meeting deceased? "Relevancy is that which conduces to the proof of a pertinent hypothesis ; a pertinent hypothesis being that which logically affects the issue." (Wharton's Cr. Ev., 21, 23.) " All facts that go either to sustain or impeach a hypothesis logically pertinent are admissible." (Wharton's Cr. Ev., 24.) Did appellant provoke the difficulty with the purpose and intent to kill ? This question the jury had to answer, and did answer. In answering this question intelligently, was it not very material for the jury to know why appellant had the pistol. Did not the jury naturally conclude that appellant had armed himself for the deceased ? The State had shown that appellant had said that if Ben Shultz did not pay for the spurs

he would take it out of his hide, etc., and the jury concluded that he had armed himself for that purpose. The proposed evidence tended to repel this theory and presumption, and was not only relevant, but was of vital importance to appellant, and its exclusion was a fatal error.

The court, in his explanation, says: "There was no evidence tending to show that defendant was carrying a pistol for deceased," etc. We frankly admit that if the court's charge can be sustained, then the action of the court in excluding this proffered evidence can be sustained, because both are based upon the theory that the defendant was guilty and was entitled to no defense. The only difference between the two was that by the charge the defendant was presumed guilty, and was required to prove his innocence; but by this ruling defendant's means of proof was absolutely cut off, and he was compelled to stand and behold the glory of the court and the beauty of his own waybill to the penitentiary!

Appellant also proposed to prove by his brother, John Bonnard, that Ben Shultz had written back, when he was out west, that he would pay for the spurs upon his return; and, further, that the spurs were worth five dollars. This evidence was material, as it would tend to show a sufficient inducement for appellant to seek an interview with Shultz, and that he did not seek the deceased with intent to provoke the difficulty, but for the purpose of collecting the five dollars.

The fourth assignment of error is as follows: "The court erred in excluding the evidence of John Bonnard to the effect that after the difficulty, and upon defendant's return home and immediately upon meeting witness, defendant was bleeding from the wounds received in the difficulty; that defendant told witness, then, that he had accidentally met deceased, and that in accordance with his (witness's) instructions, and to avoid making deceased mad, he called him out to one side and asked him to pay for the spurs, which he refused to do; that defendant then told him that he had heard that he, Ike Moore, and Ace Bizzell had invited him to a dance for the purpose of stealing his leggins; that deceased called him a d—d liar, and that he called the deceased one; that thereupon deceased struck him over the head with his six-shooter, thereby inflicting the wounds on his head; and that thereupon he fired at deceased; that after the difficulty he and Styron rode back by Welch's and that the girls there asked him about the difficulty; and that, inasmuch as he did not

know that he had hit Shultz, and knowing that Shultz and Miss Florence Bizzell were engaged to be married, and fearing that if he told them about the spurs and about Shultz taking them and refusing to pay for them, etc., it would only make matters worse between him and Shultz, he told them that Ike Moore and himself had gotten into a row; that Ike had struck him with his pistol, and that he shot at him as he ran off, etc. The State having thus introduced in evidence a part of the statement of defendant, we think defendant was entitled to his statement to his brother for the reason that they were both on the same subject, and the latter tended to explain and elucidate the former. (Harrison v. The State, 20 Texas Ct. App., 387; Green v. The State, 17 Texas Ct. App., 395.)

Tenth assignment of error is as follows: "The court erred in the definition of adequate cause in that he failed to tell the jury in the language of the statute that an assault and battery causing pain and bloodshed is an adequate cause; the facts in this case showing that before defendant fired upon deceased the deceased struck him over the head with a six shooter and cut great gashes over his head, and that he was bloody from head to foot." The defendant four or five minutes after the shooting had blood on his head and face. In an hour after the shooting he had severe wounds upon his head and was very bloody. Will Styron's evidence shows that deceased first struck defendant over the head with his six shooter before defendant fired; also that defendant was badly hurt and was bleeding from his wounds, etc.

It was certainly the duty of the court to have charged the jury, under these facts, that an assault and battery producing pain or bloodshed was in law adequate cause. (Hill v. The State, 8 Texas Ct. App., 142; Foster v. The State, 8 Texas Ct. App., 248; Williams v. The State, 15 Texas Ct. App., 617.)

*W. L. Davidson,* Assistant Attorney General, for the State: By a review of the facts of this case, it is believed that manslaughter was hardly a part of the law of this case. There had been some bad blood between the parties; both understood it, and upon their first meeting the appellant called the deceased to one side and accused him of theft, and other offensive matters, which led to the difficulty. The evidence, taken as a whole, shows that defendant was hunting up a difficulty, and armed himself for that purpose. It is also very apparent that he succeeded in finding the difficulty with one of his enemies,

and that he killed him. It is also pretty certain that the deceased knew that he was in for the trouble, and to this end he armed himself. Thus we have them both armed—both with feelings of anger towards each other, both armed with deadly weapons, and both willing and anxious for the fray, and entering willingly into the combat. This view is liberal for appellant, as I view the record. Then, if this is true, the question of manslaughter was not really a phase of the case, and any charge given on manslaughter was given erroneously in favor of the appellant; of which he can not complain, however. This would hardly be a combat upon sudden quarrel. The meeting may or may not have been an accidental meeting. It is certain that the appellant was determined upon the difficulty before the deceased returned from the west. His threats were recorded before the deceased returned, and were carried out upon his first meeting with the deceased. The sudden passion was not present. Appellant had brooded over this matter for a considerable length of time. (Spearman v. The State, 23 Texas Ct. App., 224; Crist v. The State, 2 Texas Ct. App., 361; Logan v. The State, 17 Texas Ct. App., 50; Lee v. The State, 21 Texas Ct. App., 241.)

Again, it is also evident that appellant provoked the difficulty, and that he brought about the necessity of killing his adversary —having so threatened beforehand, and having armed himself to that end, and accused him of theft after calling him out for that purpose. (Logan v. The State, 17 Texas Ct. App., 50; King v. The State, 13 Texas Ct. App., 277; Thuston v. The State, 21 Texas Ct. App., 245; Roach v. The State, 21 Texas Ct. App., 249; Willson's Crim. Stat., secs. 981, 982, 1025; Thumm's case, 24 Texas Ct. App., 667.)

Then this view would eliminate manslaughter from the case altogether. But, if I am not correct in this, then it will be seen from authorities already cited that manslaughter was properly and legally charged, and that no injury accrued to the appellant even upon the theory that manslaughter was a part of the case.

The foregoing reasoning would exclude self defense also. But if self defense is a part of this case, the court gave it fully and from the standpoint of appellant. (Willson's Crim. Stats., secs. 969, 1070.) It is useless to argue on this phase of the case further. The court had to stretch both the law and the facts to a great length in order to charge upon the theory of self defense at all. This case shows that appellant shot his adversary after

provoking the difficulty with him, and under such circumstances as to show he intended to kill him or do him serious bodily injury. This is made the more apparent because he fired at him as he ran away, and under his own version he fired twice as the deceased fled for his life. Then he either shot deceased at the immediate time of the first part of the difficulty, after provoking the same, or he shot him as he fled and after deceased's abandonment of the fight. It is murder in either event.

He is not relieved of this because the deceased may have entered into the fight willingly, nor is he benefited even if the deceased got his lick in first. Appellant fired first, and it is evident that he had his pistol out and in his hands when the deceased struck him, if deceased did strike him. The lick testified about, and the shot from the appellant's pistol were about simultaneous and showed that both parties were ready, willing and not slow to fight.

. This is as favorable a view as the appellant can ask under the facts. If the State's theory is correct, then the killing was done upon express malice, and the jury were lenient. In any event the court's charge is favorable to the appellant, and presents the case as appellant claims it, and from his standpoint.

WHITE, PRESIDING JUDGE. This appeal is from a judgment of conviction for murder in the second degree. Twenty errors are assigned for reversal, and they relate, first, to the exclusion of evidence; second, to errors in the charge of the court to the jury; third, to the refusal of special requested instructions in behalf of defendant; fourth, to the insufficiency of the evidence to support the verdict; and, fifth, to the overruling of defendant's motion for a new trial. We do not propose to discuss all these assigned errors, but will select those which are, in our opinion, the most important.

I. It was error to exclude the testimony of the witness Joe Bidwell, as shown by the first bill of exceptions, to the effect that on the night before the shooting a difficulty occurred at a party at the house of one Page, between the principal State's witness Ike Moore and the defendant, in which the witness Moore had followed the defendant out of the gate, and, when defendant told him to stop following him, turned away with the remark, "I'll see you again and will shoot a hole through you a yellow dog can go through. I am a yard wide, all wool and hard to curry." This evidence was admissible to show the mo-

tive, animus and extent of the feelings of the witness toward defendant. "The motives which operate upon the mind of a witness when he testifies are never regarded as immaterial or collateral matters." (Gaines v. Com., 50 Pennsylvania State, 319–326.) As to hostility, interest or bias against a defendant, a witness may be contradicted, if he denies them, by evidence of his own statements or of other implicatory facts. "The same rule applies to questions as to quarrels between the witness and the party against whom he is called." (Whart. Crim. Ev., sec. 485; 1 Greenl. Ev., 13 ed., sec. 455; Hart v. The State, 15 Texas Ct. App., 202; Favors v. The State, 20 Texas Ct. App., 156; Rosborough v. The State, 21 Texas Ct. App., 672. See also upon this point. Newcomb v. The State, 37 Miss., 383, and also the case of Kent v. The State, Ohio, reported in full in the sixth Crim. Law Magazine, p. 520, in which the cases are reviewed and the doctrine upon the subject elaborately discussed.) It is shown by the evidence that the witness Moore had been a party to and associated with the deceased in all the troubles and difficulties between the latter and the defendant, and the extent to which he was biased was legitimate matter to be considered by the jury in determining the credibility of his testimony.

Defendant's fourth bill of exceptions was taken to the exclusion of his statements made to his brother, John Bonnard, on the night of the difficulty, and when he first met his brother after the difficulty, in which he detailed all the circumstances of the difficulty fully, and in which he also explained to his brother the fact that he had related the circumstances differently to the young ladies at Mrs. Welch's immediately upon his return from the scene of the difficulty, and told him the reasons which induced and influenced him in making the statement as he did make it to those young ladies. The prosecution had proved by these young ladies what defendant's statements to them were, and the defense proposed to prove the statements made to his brother in order to explain these statements, under the statutory rule that "when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence." (Code Crim. Proc., art. 751.) We are of opinion the bill of exceptions brings the excluded evidence directly within the purview of the rule as the same has heretofore been construed by this court in Green v. The State, 17 Texas Court of Appeals, 395; Harrison v. The

State, 20 Texas Court of Appeals, 387; Rainey v. The State, 20 Texas Court of Appeals, 455; Gaither v. The State, 21 Texas Court of Appeals, 528, and that it was error to exclude the testimony. This case is not analogous to the Lilly Gibson case, 23 Texas Court of Appeals, 414, in this particular.

Appellant having been convicted of murder of the second degree, this eliminates from discussion all questions as to the correctness of the charge of the court as to murder of the first degree. As to murder of the second degree, manslaughter, self defense, etc., many attacks are made upon the charge as a whole and to each particular paragraph, as well as to the action of the court in refusing all of defendant's special requested instructions. It would be a useless consumption of time to attempt a review of all the matters thus presented and so strenuously urged in the oral arguments and able brief of counsel for appellant. Suffice it to say that, in quite a number of the particulars mentioned, the charge is to some extent confusing if not misleading, and in one of the particulars specially complained of is clearly erroneous. We will summarize the several phases in which the evidence presents the case to our minds and to which the charge should have been mainly, pertinently and affirmatively directed.

1. The State's theory was that defendant and deceased had been at enmity for some months, and defendant had made serious threats against the deceased; these threats had perhaps been communicated to deceased, and he was anticipating and prepared for trouble with defendant when he should meet him. Now, if under these circumstances, both parties had determined in their minds to bring on a difficulty when they should meet, in which the one intended to kill the other, or inflict serious bodily injury which might result in death, then, if such was the case and a difficulty and death ensued, no matter which provoked it, the party killing would be guilty of murder. (Penal Code, art. 603.)

2. If defendant, however, did not intend to provoke a difficulty with deceased, but sought the interview with him solely for the purpose of demanding pay for his spurs, and a difficulty ensued in which defendant, on account of abuse heaped upon him by deceased, voluntarily slew him in heat of passion engendered by the present abuse, taken in connection with the previous wrongs done him by deceased, and the circumstances all together combined were of such a character as to produce ade-

quate cause sufficient to render the mind incapable of cool reflection, then such killing would be manslaughter. (Wadlington v. The State, 19 Texas Ct. App., 266; Johnson v. The State, 22 Texas Ct. App., 206; Howard v. The State, 23 Texas Ct. App., 265.)

3.    If defendant sought an interview with deceased with no hostile intentions, and deceased became enraged and committed an assault upon defendant which did inflict pain or bloodshed, and under the passion thus engendered defendant shot and killed deceased, the pain or bloodshed would amount to "adequate cause," and the killing would be manslaughter.    The charge of the court was radically defective in not presenting this phase of the law of the case in affirmative terms.    (Hill v. The State, 8 Texas Ct. App., 142; Foster v. The State, Id., 249.)

4.    If defendant sought the interview with deceased with no hostile intentions, but simply and solely to demand a settlement and pay for his spurs, and deceased became angry and a wordy altercation ensued during which deceased drew his pistol and assaulted defendant with it in such a manner as to create in defendant's mind a reasonable apprehension of death or serious bodily injury, and, acting upon such reasonable apprehension, defendant fired the fatal shot, then and in that event he would be justifiable upon the ground of necessary self defense.    (See Willson's Crim. Stat., sec. 1070.)

These are, in our opinion, in brief the essential principles of law applicable to the facts of the case as shown by the record, and they should have been submitted plainly, fully and affirmatively, and without unnecessary verbiage, by the charge.    For the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*