# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI

### NO. 98-KA-00532-COA

**JAMES WILLIAMS A/K/A JAMES A. WILLIAMS A/K/A MUGGY
WILLIAMS**                                                              **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/1997 |
| TRIAL JUDGE: | HON. JAMES W. BACKSTROM |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | STANFORD YOUNG |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | DALE HARKEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | 11/18/1997: MURDER: SENTENCED TO SERVE A TERM OF LIFE IN THE CUSTODY OF THE MDOC AND TO PAY ALL COST OF COURT INCURRED IN THIS CASE. |
| DISPOSITION: | AFFIRMED - 9/28/1999 |
| MOTION FOR REHEARING FILED: | 10/13/99; denied 12/14/99 |
| CERTIORARI FILED: | ; granted 3/30/2000 |
| MANDATE ISSUED: | |

EN BANC.

McMILLIN, C.J., FOR THE COURT:

¶1. James Williams was convicted of murder by a jury in the Circuit Court of Greene County for the wilful killing of Johnny Powe. Williams has appealed his conviction to this Court, asserting seven issues that he contends warrant reversal of his conviction. We find the issues presented are not of sufficient gravity to require this Court's interference, and we, therefore, affirm.

### I.

# Facts

¶2. Johnny Powe was shot once in the head with a .32 caliber pistol fired by the defendant, James Williams. There was no dispute as to that fact and no dispute that Williams fired the fatal shot purposely. The State alleged that the shooting was done with the deliberate design to effect Powe's death. Williams claimed that he shot in self-defense. In order to fully understand the competing theories of Powe's death, it is necessary to begin the narration of the facts at a different location from the crime scene and at an earlier time on the same day as the shooting.

¶3. For reasons not entirely clear in the record, the defendant, James Williams, and another individual named Kevin McCarty had gotten into a physical altercation in the parking lot of a convenience store in Little Creek in the early afternoon of June 7, 1996. The fight apparently was an outgrowth of the fact that Williams and McCarty had, at different times, been romantically involved with the same woman. Johnny Powe and McCarty were friends, and, in fact, were in each other's company at the convenience store, though the evidence suggested that Powe had remained in his van during his friend's confrontation with Williams and was not aware that it had occurred until after it was over.

¶4. McCarty, who was the State's primary eye-witness to the shooting, testified that he and Powe subsequently left the store in Powe's van to return to Powe's residence. Their path took them through a public park commonly known by the unfortunate name of Pistol Park, where they observed Williams and several of his associates. According to McCarty, Powe stopped the van and got out to confront Williams about his recent aggressive behavior toward his friend. Upon departing the van, Powe took with him an AK-47 rifle that he routinely carried in his vehicle. McCarty testified, however, that Powe merely carried the weapon in one hand, keeping it pointed toward the ground. Though McCarty followed Powe, he testified that he trailed so far behind that he could not hear the actual conversation, but he observed Powe to be in a discussion with Williams's two companions when Williams, standing to Powe's side, suddenly and without warning produced a pistol, placed it against Powe's head, and discharged the weapon. As Powe fell to the ground mortally wounded, all those in the area fled the scene. However, McCarty admitted that, before fleeing, he retrieved Powe's AK-47 rifle and took it with him. McCarty eventually reported to the police the fact that Powe had a weapon in his hand at the time he was shot.

¶5. The State produced an expert in forensic pathology who had completed the autopsy on Powe. This expert testified that the shot causing Powe's death had entered the side of his skull. He referred to the injury as a "contact wound," meaning that the muzzle of the weapon had either been in contact with Powe's head or at a distance no greater than one quarter inch at the time of discharge. In the course of his testimony, the forensic pathologist indicated that Powe's body had contained a number of scars that were well healed and, therefore, not recently incurred. He also testified that Powe was a man of substantial bulk, weighing in the range of 360 pounds at the time of his death.

¶6. The defense produced eye-witnesses who testified that, after the incident at the convenience store, Powe had driven to Pistol Park and, after locating Williams, had driven by while a passenger held the AK-47 rifle out the van window in a threatening manner. These witnesses also testified that Powe drove by a second time while making verbal threats toward Williams. He finally returned a third time, stopped the van, and exited with the rifle. These witnesses claimed that Powe went directly to Williams and began to berate him for his mistreatment of McCarty earlier in the day, and to make threats that at least implied that he (Powe) was prepared to end Williams's life. According to these witnesses, Powe grabbed Williams by the

shoulder with his free hand and began to shake him. When Williams pulled away, Powe reportedly put both hands on the rifle and began to raise it to firing position. However, before he could accomplish this move, Williams was able to retrieve a pistol from his pocket and fire first, striking Powe in the head. One witness testified that he had given Williams the pistol only a few moments before the shooting when he became concerned for his friend's safety based on the threatening manner in which Powe was acting while driving by in his van. Williams testified in his own defense and expressed the idea that he fired only because he saw Powe beginning to raise his own weapon, causing Williams to fear for his life.

¶7. In laying the predicate for a claim of self-defense in opening statement, defense counsel alluded to the fact that Powe "had scars all over, he had been a tough fellow all his life." The subject came up again during defense counsel's cross-examination of the state's forensic pathologist, during which defense counsel elicited the fact that the old scars on Powe's body were "consistent with probably cut wounds." Over defense counsel's objection, the State was permitted to call Powe's mother as a witness to report that her deceased son was a Vietnam veteran who had received two Purple Heart medals for injuries suffered during his combat service.

¶8. The jury was instructed on murder, manslaughter, and self-defense, and returned a verdict of guilty of murder. Williams's post-trial motion for relief from the verdict at the trial level was unsuccessful and this appeal ensued. We will address the issues raised by Williams in the same order presented in his brief.

## II.

### The First Issue: The Weight of the Evidence

¶9. Williams urges that the great weight of the evidence presented at trial points to the fact that this was a classic case of a killing in self-defense. It is our duty, in assessing such a claim, to view the evidence in the light most favorable to sustaining the jury's verdict. *Gossett v. State,* 660 So. 2d 1285, 1294 (Miss. 1995). Only if we are convinced, after viewing the evidence in this light, that a manifest injustice has occurred are we permitted to intercede. *Id.* Our evaluation of the proof is further colored by the proposition that it is the province of the jury to observe and listen to the witnesses, assess their credibility, and ultimately decide what weight and worth to give to any particular evidence. *Id.* It is the duty of the jury, when faced with competing versions of events, either of which appears plausible based on the physical evidence, to decide which version it chooses to believe. A decision to upset that determination must be based upon something more than the mere numbers of witnesses testifying as to one particular version over another. *Groseclose v. State,* 440 So. 2d 297, 300 (Miss. 1983).

¶10. In this case, the State presented evidence from an eye-witness that, if believed by the jury, would support a conviction of murder. The mere fact that Powe was carrying a rifle when he came on the scene at Pistol Park does not, as a matter of law, mark him as one bent on doing serious bodily injury to another such that anyone in his presence would have the unequivocal right to kill him. McCarty's testimony was that Powe was not even engaged in a conversation with Williams at the time he was shot, but was, instead, speaking with two of Williams's associates with the rifle held at his side with the barrel pointed to the ground. Also absent from McCarty's version of events were the two preparatory trips past Williams reported by Williams's witnesses where Williams was allegedly subjected to menacing gestures with the rifle and threatening language.

¶11. Neither can this Court ignore the proposition that the forensic evidence, indicating that Powe was shot

from a pistol held to the side of his head at a range of one quarter inch or less, appears more consistent with McCarty's version of events than the version related by Williams and his witnesses. At a minimum, it would be an unusual sequence of events that would permit one attempting to evade the grasp of a 360 pound assailant armed with a deadly assault rifle to simultaneously pull a pistol from his pants pocket and deliver a gunshot wound at point blank range to the side of the assailant's head. We cannot say, based upon our review of the evidence in the record and our understanding of the role the jury plays in determining what they believe the true facts to be, that McCarty's version of events, as corroborated to some extent by the physical evidence, was so unbelievable or implausible as to suggest that a manifest injustice occurred when the jury elected to accept his version as true. Neither do we find the witnesses who appeared for the defense to be so persuasive or convincing in their testimony as to convince us that, had the jury given that evidence the proper weight, a different verdict would have been indicated to avoid a substantial miscarriage of justice.

¶12. We, therefore, conclude that Williams is entitled to no relief on this issue.

### III.

### The Second Issue: The Admissibility or, Alternatively, the Misuse of Powe's War Record

¶13. Williams urges that the State misused information that Powe was a decorated Vietnam combat veteran to inflame the jury by appealing to their passion in order to obtain a conviction based upon something other than a reasoned view of the evidence. He attacks the evidence from two directions. First, he claims that the evidence was not admissible, and second, he claims that, even assuming its admissibility, the State engaged in prosecutorial misconduct by using the evidence for the sole purpose of inspiring prejudice against Williams. We will deal with both propositions.

### A.

### The Admissibility Question

¶14. The opening of a line of inquiry deemed helpful to the defense theory of the case presents the State with the opportunity to present evidence to rebut the defense's theory. It has been said that, by undertaking such an effort, the defense has "opened the door" to evidence that might otherwise have been inadmissible as having little or no probative value. *Eakes v. State,* 665 So. 2d 852, 868 (Miss. 1995).

¶15. Both in its opening statement and during cross-examination of the forensic pathologist, the defense sought to portray the victim, Johnny Powe, as being no stranger to violent physical conflict. Clearly, the intention of the defense was to portray Powe as an aggressive man with a history of involvement in altercations involving the use of dangerous weapons. The evident purpose of this evidence was to create an impression among the jurors that Powe was a man entirely capable of, and perhaps even predisposed to, inflicting serious injury on Williams, thus making his claim of self-defense more plausible. However, the effort of the defense to focus on this aspect of Powe's prior life, even though only raised by innuendo, necessarily permitted the State to offer an explanation as to the source of Powe's various prior wounds. The State did nothing more than that when it put into evidence the fact that Powe had been engaged in armed combat as a member of the armed forces in Vietnam and had been wounded on at least two occasions as evidenced by the fact that he was the recipient of two Purple Hearts.

¶16. Whether evidence that Powe was a Vietnam combat veteran twice decorated for injuries who

persisted years later in traveling armed with a military assault rifle would tend to lessen or increase the likelihood that he would attempt to settle a grievance through the use of that weapon is a matter that might be the subject of fair debate. Nevertheless, it is beyond dispute that, by hinting broadly that Powe had a history of violent confrontations involving deadly weapons, the defense opened the door to the State to shed more light on the true nature of Powe's past. The State seized on that opportunity and the defense may not now be heard to complain about it.

¶17. In the caption of one issue in his brief, Williams urges that the probative value of this evidence, even if admissible, was substantially outweighed by its prejudicial impact. Though we find no supporting argument for this proposition in the text following the caption, we note that such a claim is separate from the issue of the probative nature of the evidence and normally requires a specific objection raising considerations found in Mississippi Rule of Evidence 403. No such objection was made regarding the introduction of the evidence of Powe's war experience. The trial court may not, as to questions of evidence, be put in error on matters upon which it was not offered the opportunity to rule. *Lewis v. State,* 725 So. 2d 183 (¶16) (Miss. 1998). The absence of a Rule 403 objection to the evidence constitutes a waiver of any complaint that this evidence, though otherwise admissible, should have been excluded because of its potential to substantially prejudice the defense.

## B.

### Subsequent Prosecutorial Misuse of the Evidence

¶18. Alternatively, Williams argues that the State misused the evidence by repeatedly harping on the contrast between Powe and Williams in summation, referring to one as a war hero and the other as a thug. He relies principally on the case of *Bridgeforth v. State,* 498 So. 2d 796 (Miss. 1986). In that case, the Mississippi Supreme Court reversed a conviction for prosecutorial remarks found to be an improper comment on the defendant's right not to testify. *Id.* at 798-99. The Court went on later in the opinion to criticize the prosecutor for saying, during summation, that, "If I thought I could stand on my head and that would convince you to get this scum off the street, I'd do it." *Id.* at 801. Though the court roundly criticized this "personal vilification" of the defendant by the prosecution, the opinion does not stand for the proposition that the remark, standing alone, would have justified reversing Bridgeforth's conviction.

¶19. We have reviewed the argument made by the State in summation in the case before us. Understandably, the prosecution chose to focus to some degree on Powe's status as a decorated war veteran, much as the defense would have been expected, had the evidence gone otherwise, to focus on Powe's past history as a man prone to violent confrontations with others. When the defense to an admitted killing is a claim that the defendant was acting in necessary self-defense, we think it is within the bounds of proper advocacy to portray the victim in a light that would make him less likely to engage in hostile and aggressive behavior. Given the wide latitude afforded to both parties in summation (*See, e.g., Ahmad v. State,* 603 So. 2d 843, 846 (Miss. 1992)), we conclude that the emphasis placed by the State on Powe's military record was not so inflammatory or prejudicial that we need interfere to set aside this verdict.

¶20. As to the State's reference to the defendant and his companions as "thugs," we note that the trial court immediately sustained an objection to that characterization and admonished the jury to disregard it. The record reflects that the defense did not subsequently move for a mistrial. On that basis, we conclude that the trial court properly handled the matter. A motion for mistrial is essential in order to preserve error after an objection to improper summation has been sustained. *Mason v. State,* 32 So. 2d 140, 140 (Miss. 1947).

## IV.

### The Third Issue: Denial of Defense Instructions

¶21. Williams requested three instructions on the various aspects of self-defense, all of which were refused by the trial court because the court concluded that other instructions, already given, adequately addressed the various aspects of self-defense. Williams now complains on appeal that the denial of these three requested instructions prevented him from properly putting his theory of the case before the jury.

¶22. At the threshold of our analysis, we observe that it is well-established that we do not view instructions in isolation. *Higgins v. State,* 725 So. 2d 220 (¶16) (Miss. 1998). Rather, we are charged to view the instructions given to the jury in their entirety and to decide, based on that review, whether the jury was properly charged as to the law on the various aspects of the case. *Williams v. State,* 667 So. 2d 15, 24 (Miss. 1996). Merely because a refused instruction was a correct statement of the law does not make its refusal reversible error. *Holden v. State,* 399 So. 2d 1343, 1345-46 (Miss. 1981). Such instructions, for example, may be refused if they are merely duplicative. *Gossett v. State,* 660 So. 2d 1285, 1295 (Miss. 1995). In fact, it has been held that the very act of repeatedly instructing the jury as to one particular aspect of the case may, in itself, prove detrimental to a fair trial since it increases the likelihood that the jury will put undue focus on that portion of the law. *See McWilliams v. State,* 338 So. 2d 804, 806 (Miss. 1976).

¶23. For purposes of our discussion, we have attached as Appendix A to this opinion the full text of requested and refused defense *instructions* numbered D-5, D-5A, and D-6. We also include in that appendix the text of Instruction S-7 on self-defense that was given to the jury.

¶24. In this case, the court gave a self-defense instruction that was, in all essential parts, identical to the self-defense instruction recommended for future use in *Robinson v. State,* 434 So. 2d 206, 207 (Miss. 1983) (*overruled on other grounds*).

¶25. The only argument advanced by Williams concerning the jury's lack of instruction on self-defense was that the jury was not properly instructed on the notion that the danger of imminent death or injury need not be actual if the circumstances make the danger seem apparent to the defendant as situated at the time, so long as that perception is deemed a reasonable one under the circumstances. *Gooch v. State,* 199 Miss. 280, 24 So. 2d 736 (1946). In response to that argument, we note that Instruction S-7 included a charge that the danger of death or harm must be actual, "or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or to do him some great bodily harm . . . ." We find that this passage accurately and adequately explained the proposition to the jury, as it did all the remaining essential elements of self-defense.

¶26. We note parenthetically that the instruction recommended in *Robinson* and given in this case has recently been criticized by the Mississippi Supreme Court, not for being an incorrect statement of the law of self-defense, but for its failure, after setting out the theory of self-defense, to go on to explicitly inform the jury of its obligation to acquit should it conclude that a case of self-defense had been made out. *Reddix v. State,* 731 So. 2d 591 (¶20)(Miss. 1999). The same shortcoming exists in Instruction S-7 in our case that existed in *Robinson* and *Reddix.* However, in our case, Williams offered no objection to Instruction S-7 at the time it was offered on this or any other ground. His arguments to the trial court and to this Court in support of his additional instructions do not focus on the failing of the instruction discussed in *Reddix.* Even

assuming for sake of argument that *Reddix* would require us to consider this omission from Instruction S-7 as plain error, we observe that Instruction S-1, in setting out the elements of the crime of murder, specifically placed the burden upon the State to prove beyond reasonable doubt "[t]hat the shooting was not in necessary self-defense . . . ." That instruction went on to charge the jury to find Williams not guilty "[i]f the State has failed to prove any one or more of these elements [of the crime of murder] . . . ." Reading Instructions S-1 and S-7 in tandem, we conclude that the concerns with the so-called "*Robinson* instruction" discussed in *Reddix v. State* do not arise in this case.

¶27. We conclude that the refused instructions were duplicative of the essential elements necessary to seek an acquittal on the basis of self-defense. To have granted any one or all of them would have raised the possibility of putting too much emphasis on this aspect of the case. The trial court did not err in refusing the instructions.

## V.

### The Fourth Issue: Whether Manslaughter Was the Only Possible Verdict

¶28. Relying on the case of *Wells v. State,* Williams urges that the evidence was insufficient as a matter of law to prove the deliberate design necessary to convict him of murder and that, therefore, the worst offense he could possibly have committed was the crime of manslaughter. *Wells v. State,* 305 So. 2d 333 (Miss. 1974). In *Wells*, the defendant and the deceased had engaged in a physical altercation that was initiated by the deceased. The defendant, in the course of the struggle, produced a knife in an attempt to extricate himself from the deceased's armlock around his neck which was interfering with his ability to breath. *Id.* at 334. Wells claimed that the deceased slipped or fell or otherwise jerked, accidentally falling against the knife and severing his jugular vein. *Id.* The jury convicted Wells of murder. The supreme court, apparently reluctant to totally accept Wells's view of the events, nevertheless concluded that there simply was no evidence to support a finding of premeditation on these facts. *Id.* at 336. Therefore, the court reversed the murder conviction and remanded for resentencing for manslaughter. *Id.* at 340.

¶29. That case has no particular application to the facts of the case now before us. In the case before us, there was eye-witness testimony that indicated that Powe was not involved in an attack on Williams nor was he engaged in any physical or verbal confrontation with Williams when he was shot unexpectedly in the side of the head. Had there been evidence in *Wells* that Wells had approached the deceased from the side and cut his throat while the deceased was involved in conversation with other individuals, the case might have some applicability. However, there was no such evidence in *Wells*. The factual distinctions between the two cases are so large that, in our view, nothing meaningful can be learned from the legal concepts discussed by the *Wells* Court.

## VI.

### The Fifth Issue: Was It Error to Give Instruction S-6?

¶30. The State, for reasons that are not readily apparent, requested Instruction S-6 in the following form:

> The Court instructs the Jury that where two or more persons engage in mutual combat, not in reasonably necessary self-defense but each with the intent to kill or do serious bodily injury to the other, and one more of said persons does, in fact, kill the other, then the person or persons while acting alone or encouraging, aiding, or assisting in any manner in the killing, shall be guilty of murder.

¶31. Also, for reasons that are not entirely clear, the trial court granted the instruction. Williams now complains on appeal that it was reversible error to give the instruction since there was no factual basis to conclude that Powe and Williams were engaged in mutual combat at the time Powe met his fate.

¶32. This instruction concerning mutual combat may have, indeed, been a correct statement of the law when considered in the abstract. However, it is grievously flawed for its failure to define what is meant, under the law of homicide, by a mutual combat, and it was further improper because of lack of any support in the evidence for such an instruction.

¶33. The term "mutual combat" is one for which an uninstructed juror might intuitively find some meaning, but we conclude that if the State truly intended to advance the alternate proposition that this killing was the result of a mutual combat between Powe and Williams, it was incumbent upon the prosecution to more fully develop the evidence on the point and to seek further instructions informing the jury of the true legal meaning of the phrase.

¶34. The definition of the term was set out with some clarity (and commendable modesty) by the Oklahoma Supreme Court in the 1908 case of *Driggers v. U.S.* as follows:

> It [mutual combat] means, in different language, though probably not more clear, an agreement or meeting of minds between two parties to fight, whether with or without arms. It means a coming together, with a mutually understood purpose for a violent contest.

*Driggers v. U.S.*, 95 P. 612, 621 (Okla. 1908).

¶35. The Court of Appeals of Texas dealt with the theory of "mutual combat" in a case that, rather sadly but colorfully, involved a homicide growing out of a dispute over the purchase price of a pair of spurs. *Bonnard v. State,* 7 S.W. 862 (Tex. Ct. App. 1888). In that case, the Texas court explained the theory and consequences of "mutual combat," saying as follows:

> The state's theory was that defendant and deceased had been at enmity for some months, and defendant had made serious threats against the deceased; that these threats had, perhaps, been communicated to deceased, and he was anticipating and prepared for trouble with defendant when he should next meet him. Now, if under these circumstances both parties had determined in their minds to bring on a difficulty when they should meet, in which the one intended to kill the other, or inflict serious bodily injury which might result in death, then, if such was the case, and a difficulty and death ensued, no matter which provoked it, the party killing would be guilty of murder.

*Id.* at 864-65.

¶36. In the case now before this Court, there was no direct evidence, nor any evidence that would tend to support an inference, that both Powe and Williams traveled by common consent to Pistol Park for the purpose of engaging in a "violent contest" to settle their differences. There is, in fact, no evidence indicating that Williams was even aware of Powe's concern about his previous confrontation with McCarty until Powe appeared in the park. Further, there is nothing in the record to support an inference that, after encountering

each other in the park, both Powe and Williams formed an intent to engage in a fight, each intending to use the weapons at his disposal to attempt to inflict grievous injury upon the other. Absent some proof to support a reasonable inference that one or the other of these scenarios explained Powe's subsequent death, the issue of "mutual combat" simply was not in the case.

¶37. In this case, the State's sole theory to support the crime of murder was that Powe was not actively involved in an actual assault on Williams nor was he engaged in behavior from which Williams could reasonably, though mistakenly, conclude that Powe was intent on doing him serious harm. None of the evidence presented by the State would permit the jury to reasonably conclude that Williams and Powe, by mutual agreement, tacit or otherwise, met in Pistol Park for the purpose of engaging in a mutual combat in which each was intent on causing serious bodily injury or even the death of the other. In the absence of evidence to support such an alternate construction of the incident, we cannot see the basis for requesting a mutual combat instruction.

¶38. Nevertheless, we observe that the sole objection raised to the instruction by the defense was that it did not properly explain the meaning of the term "self-defense" as set out in the instruction. Since self-defense was properly defined in another instruction and since the instructions are intended to be considered by the jury in their totality and not in isolation, there was no need for this particular instruction to re-define each of its terms so long as a proper definition was given elsewhere. *Malone v. State,* 486 So. 2d 360, 365 (Miss. 1986).

¶39. Since there was no objection based on the notion that the facts simply would not support the instruction - a different objection from the one actually raised at trial - we find that we are procedurally barred from considering any error in giving this instruction under the well-known principle that a trial court may not be put in error on matters upon which it was not offered the opportunity to rule at trial. *Gray v. State,* 728 So. 2d 36 (¶110) (Miss. 1998).

¶40. We further observe that the instruction, though probably inappropriate on these facts, would not appear so damaging to the defense as to deny him a fundamentally fair trial. The jury was adequately instructed on the elements of murder and on the factors to be considered in deciding whether the defendant was legitimately acting in self-defense when he shot Powe. Since these were the crucial issues upon which the case turned, we are satisfied that this brief instructional excursion into the hoary concept of mutual combat, even if the error were procedurally preserved, would be harmless.

## VII.

### The Sixth Issue: Accumulation of Error

¶41. Finally, Williams argues that the accumulated effect of these various perceived missteps during the course of his trial, when considered in the aggregate, demonstrates that he was denied a fundamentally fair trial. Having concluded that the great bulk of those issues raised by Williams were not error, we cannot conclude that the accumulated effect of the matters raised in this appeal worked together to undermine the fundamental fairness of the trial. The only real error of any significance was the trial court's decision to grant a "mutual combat" instruction; however, we have determined that, in all likelihood, the impact of that error was so insignificant as to render it harmless. We decline to find that the accumulation of perceived errors in this case, when viewed together, had the effect of denying Williams a fair trial. Williams was vigorously represented at trial and his self-defense theory was put squarely before a jury properly instructed in the law

on that subject.

¶42. It is entirely reasonable to conclude that the jury's verdict was based upon its rejection of Williams's theory of defense and not upon some misconception of the true issues to be decided or upon improper prejudice against Williams fanned into flame by inadmissible evidence and prosecutorial misconduct. On that basis, we find ourselves obligated to affirm the jury's verdict.

¶43. **THE JUDGMENT OF THE CIRCUIT COURT OF GREENE COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**KING AND SOUTHWICK, P.JJ., DIAZ, IRVING, MOORE, AND PAYNE, JJ., CONCUR. LEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES AND THOMAS, JJ.**

LEE, J., DISSENTING:

¶44. In my opinion, the majority, by sustaining Williams's conviction for murder for the death of Johnny Powe, in essence has granted permission for one to brandish an AK-47 with the confidence that he can call the "shots", giving those in his presence no protection through a claim to self-defense. The opinion states that, "The mere fact that Powe was carrying a rifle when he came on the scene at Pistol Park does not, as a matter of law, mark him as one bent on doing serious bodily injury to another such that anyone in his presence would have the unequivocal right to kill him." This statement ignores the fact that this was no ordinary rifle, but an AK-47, an assault weapon, whose import into the United States was banned during the 1980's because of the propensity of its use by criminals. It is my opinion that a confrontation in this setting by one carrying such a weapon in his hand in and of itself gives rise to the presumption that that person intends to do serious bodily injury to the person being confronted. In *Cook v. State,* 467 So. 2d 203, 205 (Miss. 1985), the defendant appealed a guilty verdict for manslaughter for firing a gun in defense of being hit with a pool stick. Certainly it is unjust to expect that a person confronted with an assault weapon should be required to second-guess the intentions of the carrier of the weapon, that is, whether he actually intends to use the weapon or whether he is exploiting it as a "bully". It is thus clear that when Powe came out of the van that he was flaunting anything but an olive branch or open palms as a symbol of peace.

¶45. The majority finds it difficult to ascertain how Williams could physically take his pistol from his pocket if he were actually being threatened by Powe. The forensic evidence contained in the record reveals that Powe's fatal wound was inflicted as a result of immediate contact of the gun to Powe's head. This evidence flies in the face of the majority's assertions that Powe offered no threat to Williams. Rather, it indicates that Powe was in close mutual contact, if not combat (physical or verbal) with Williams. Nothing in the record reveals that there had been an ongoing conflict between Williams and Powe prior to that day's events. It is apparent that Powe was serving as an avenger for the initial cause pursued by McCarty. Williams left the scene of the initial confrontation and went to the park with McGee. There is no indication in the record that Williams and Powe planned to meet at the park for a confrontation or any other reason. It is beyond reason and logic that Powe stopped at the park for any reason other than to harass and intimidate Williams. It is not difficult to conclude that Williams was intimidated and fearful for his safety, as would most anyone confronted by someone carrying an AK-47 assault weapon, and that his actions were motivated by self-defense. However, it is my opinion that the granting of jury instruction S-6, regarding mutual combat, misled

the jury, making it virtually impossible for it to come to this conclusion.

¶46. The majority agrees that this instruction was flawed in failing to define the term "mutual combat" but it did not find it to be so damaging as to have denied Williams a fundamentally fair trial since the jury was instructed on the elements of murder and on the factors to consider in determining whether Williams acted in self-defense. I disagree. This instruction directed the jury to find Williams guilty of murder if it determined that Williams and Powe were in mutual combat. Though we must accord great deference to verdicts by properly instructed juries, because of the difficulty of achieving justice and fairness we review trial proceedings with great care. The instruction, in failing to define mutual combat, left it up to the discretion of the jury to determine its meaning, opening the door for it to find that Williams was guilty of murder, as it did.

¶47. I therefore respectfully dissent.

**BRIDGES AND THOMAS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.**

### Appendix A

### Instruction D-5

The court instructs the jury for the Defendant, James Williams, that the right of self-defense is one of our inalienable rights. Any person assaulted by another has the right to repel the assault with such force as may to him be apparently and reasonably necessary. He should be judged in the light of the surrounding circumstances then apparent to him, rather than in light of after developed facts.

If you believe from the evidence in this case that the Defendant, James Williams, was not the aggressor, and that he was assaulted with threats and physical force by Johnny Powe, then the law of self-defense is that the Defendant then and there had the right to repel such threats and assaults by using all such force as to him was then reasonably and apparently necessary to repel such assault on him and defend himself. If no greater force was under such circumstances then used by Defendant, James Williams, it is your duty to find the Defendant, James Williams, not guilty.

### Instruction D-5A

The Court instructs the jury that the law is that a man assaulted, or about to be assaulted, with a deadly weapon is not required by the law to wait until his adversary is on equal terms with him, but may rightfully anticipate his action and kill him, when to strike in anticipation reasonably appeared to be necessary to self-defense; and, unless the jury are satisfied to a moral certainty and beyond every reasonable doubt that the deceased, at the time of the killing, was not attempting to use a gun, then they must find the Defendant not guilty.

### Instruction D-6

The Court instructs the jury that the Defendant was entitled to act upon appearances, and if the conduct of the deceased was such as to induce in the mind of a reasonable person, situated as he was, under all the circumstances then existing, and viewed from the standpoint of the Defendant, a fear that death or great bodily harm was about to be inflicted by the deceased on him, it does not matter if there was no such danger provided that the jury believe that the Defendant acted in self-defense from real and honest conviction, then the jury should find him "not guilty", even though they believe that at the time he was

mistaken and that he was not in any great danger.

## Instruction S-7

The Court instructs the Jury that to make a killing justifiable on the grounds of self-defense, the danger to the Defendant must be either actual, present and urgent, or the Defendant must have reasonable grounds to apprehend a design on the part of the victim to kill him or do him some great bodily harm, and in addition to this, he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the Jury to determine the reasonableness of the ground upon which the Defendant acts.